# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 12, 2016 Session

## STATE OF TENNESSEE v. JOSEPH A. CUNDIFF

**Appeal from the Criminal Court for Sumner County
No. 4272013 Dee David Gay, Judge**

_____

**No. M2015-00563-CCA-R3-CD – Filed September 6, 2016**

_____

Defendant, Joseph A. Cundiff, was indicted by a Sumner County Grand Jury for premeditated first degree murder of his wife and unlawful possession of a handgun by a felon. After a jury trial, Defendant was found guilty of second degree murder. Defendant pled guilty to unlawful possession of a weapon by a felon. The trial court imposed concurrent sentences of twenty-five years for second degree murder and two years for unlawful possession of a handgun by a felon. On appeal, Defendant argues that: 1) the trial court erred by denying his motions for judgment of acquittal; 2) the evidence was not sufficient to support his second degree murder conviction; and 3) the trial court erred in sentencing him to the maximum sentence for second degree murder. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

James J. Ramsey, Gallatin, Tennessee, for the appellant, Joseph Alan Cundiff.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Lawrence Ray Whitley, District Attorney General; and Lytle A. James, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Facts

*State's Proof*

Officer Stephen Hughes of the Hendersonville Police Department testified that on February 13, 2013, at approximately 10:00 p.m., he responded to a shooting call at Defendant's home in Hendersonville. As he approached the front door of the residence, Officer Hughes could hear a "male subject" screaming from inside the house. Officer Hughes attempted to open the front door, but the screen door was locked. He then "banged on the front door really loud" and identified himself as a police officer. Officer Hughes testified that Defendant opened the front door, unlocked the screen door, and the officer walked into the house. Officer Hughes immediately saw the victim, Ashlee Miller, and he asked Defendant the whereabouts of the firearm. Defendant indicated that the weapon was near the victim. Officer Hughes walked over to the victim, who was lying on the floor in the middle of the room, to assess her condition. He testified that the victim was "somewhat breathing" and making "gurgling noises." "Her right hand was placed up against the right side of her head with a cloth holding her head together. There was significant damage to both the right and left side of victim's head." She was unresponsive to Officer Hughes' request to squeeze his hand with her left hand. Officer Hughes again asked Defendant the whereabouts of the weapon, and Defendant responded, "Somewhere over there."

EMS personnel arrived at the residence, and Officer Hughes along with Sergeant Kevin Folsom checked the residence to see if anyone else was there. Defendant indicated that his children were next door. Officer Hughes and Sergeant Folsom continued looking for the weapon but did not find it. Defendant had told them that the gun was a "silver .357" but he did not know the make or model. Defendant also told the officers that he and the victim were cleaning the gun and that the victim shot herself. Officer Hughes noted that he saw a holster lying on the floor. Concerning Defendant's emotional state Officer Hughes testified: "He was up and down. One minute, like I said, he could tell me the firearm was a .357, silver revolver; the next minute he was crying and you couldn't understand what he was saying." Defendant said that the victim was sitting on the couch when she was shot.

Sergeant Folsom of the Hendersonville Police Department testified that when he walked into the residence, Defendant was lying on the floor in a "fetal position," screaming and yelling. Sergeant Folsom walked over to Defendant, got Defendant to stand up, and checked him for wounds. He then walked outside with Defendant so that EMS personnel could get into the house. Captain David Herrington, a first responder

2

with the Hendersonville Fire Department, testified that he was dispatched to the shooting. When Captain Herrington arrived, he observed Defendant standing on the porch with a police officer. He said that Defendant was emotional and distraught. The victim was breathing when Captain Herrington went into the house to assess her condition.

Robert Watts, a former police officer and reserve officer, testified that he lived next door to Defendant. On the night of February 13, 2013, sometime after 9:00 p.m., Mr. Watts heard a knock on the door. When he opened the door, Defendant was standing there with his two children. Defendant told Mr. Watts that the victim had fallen and struck her head. When Mr. Watts asked if Defendant had called for an ambulance, Defendant replied, "No, not yet." Mr. Watts told Defendant that he would watch the children, and Defendant left. Mr. Watts noted that when he opened the door to let the children inside, Defendant said that the victim's injury was bad and that Defendant could "see her brains." Mr. Watts also testified that Defendant had blood on him, and he seemed upset. However, Mr. Watts listened to the 911 call and said that Defendant did not sound anything like that when he talked to Defendant before the call was made. The children were crying, and Mr. Watts and his mother attempted to calm them down after Defendant left. Mr. Watts testified that at some point, he became concerned because the ambulance had not yet arrived, and he called the police department.

Detective Christopher Gagnon of the Hendersonville Police Department testified that he and Detective Steffy drove to the scene and spoke with the officers, including Officer Hughes. Defendant was sitting on the front porch. Defendant told him that he and the victim had the weapon out and that Defendant was cleaning it and "making it look pretty, and the double action hammer was cocked back and it went off." He indicated that the victim was standing next to him when the weapon discharged. Defendant gave verbal consent for the detectives to search the residence, but as Detective Gagnon was completing a form for written consent, it was noticed that Defendant's "mental state was debilitating." Detective Gagnon stated:

> It was apparent that between the first interaction that I had with him and whenever we had gotten the consent to search form completed and he was beginning to sign it, that he was - - there was something wrong. He looked like he was becoming under the influence of something. So we shut the scene down and stopped processing everything and went and got a search warrant.

Detective Gagnon testified that he noticed a significant difference in Defendant's "motor functions, as well as his speech." He said that Defendant's "signature got to the point to where it didn't even look like handwriting anymore." Defendant had previously told

3

Detective Gagnon that he was not under the influence of anything. Detective Gagnon testified that Defendant never indicated that the victim shot herself.

Detective Gagnon testified that he took Defendant's blood stained clothing, and Defendant rode with him to the police station. On the way there, Defendant passed out in the passenger seat. Detective Gagnon woke Defendant up when they arrived at the police station, and Defendant walked into the interview room. Sergeant Vaughn then began talking to Defendant. Detective Gagnon testified that during the interview:

> It had gotten to the point to where at one point he was - - he wasn't able to hold himself up. He was leaning forward or he'd be in mid-sentence and he would just stop talking. It was obvious that he was shutting down - - whatever he was on was shutting down his ability to communicate, much less hold himself up. He had some odd behavior.

Detective Gagnon testified that once it was realized that Defendant "had taken apparently an extraordinary amount of medication," he contacted the poison control center, and Defendant was eventually taken by EMS personnel to the Hendersonville Emergency Room (E.R.). Detective Gagnon rode in the ambulance with Defendant to the E.R.

Detective Gagnon testified that a search warrant of Defendant's person was executed at 3:28 a.m. at the E.R. They took blood, pictures of Defendant's body, swabs of his hands due to blood on them, and DNA swabs of Defendant's mouth. Defendant's cell phone was also packaged and sent to the Tennessee Bureau of Investigation (TBI) Crime Lab for analysis. Detective Gagnon testified that once the search was complete, Defendant was sitting up in the bed, and he seemed to comprehend everything that was going on around him.

Detective Gagnon spoke with Defendant who "was very clear and concise again with his comments and very straightforward." He noted that Defendant lost his composure a couple of times and began crying. Defendant Gagnon testified that he read Defendant his *Miranda* rights, and Defendant agreed to speak with him. Defendant admitted that he and the victim had been arguing prior to the shooting. Detective Gagnon stated:

> I asked him about the gun itself and tried to have him elaborate on exactly how things unfolded. He had stated that he was cleaning it; stated he was cleaning it with a T-shirt. I was trying to figure out what T-shirt he was cleaning it with. He didn't seem to know, but eventually said that it was probably the T-shirt that he was wearing.

4

He stated that he was cleaning the inside of the barrel the - - he said it was open. I tried to have him elaborate on that. I asked him what was open, and he kept referring to the cylinder. So I asked him if it was the cylinder. He stated, yes, the cylinder was open; he was cleaning the inside of the barrel. And he believed the hammer had been pulled back, and the gun went off.

Detective Gagnon testified that he also attended the victim's autopsy. The medical examiner gave him "samples from blood spotting, some hair, and some bullet fragments."

Detective Seneca Smith of the Hendersonville Police Department testified that she was dispatched to Vanderbilt Hospital to photograph the victim's body and collect evidence, including her clothing and fingernail scrapings.

Dr. Adele Lewis testified that she performed an autopsy on the victim. She determined that the victim died from a gunshot wound to the left side of her head, and the manner of death was homicide. She retrieved some bullet fragments from the victim's brain. Dr. Lewis noted that the victim was pronounced dead on February 19, 2013.

Detective Sergeant Jim Vaughn of the Hendersonville Police Department testified that he spoke with Defendant at the Hendersonville Police Department and that he collected a gunshot residue kit (GSR) from Defendant because Defendant indicated that he thought the gun went off in his hand. He noticed that one of Defendant's knuckles appeared to be swelling. Sergeant Vaughn testified that Defendant mentioned something about grilling hot dogs and that the argument between him and the victim had lasted over the past two or three days. He saw scratches on Defendant, and one in particular on the back of Defendant's neck. The parties stipulated that the scrapings taken from the victim's fingernails was inconclusive of any DNA other than the victim's.

Sergeant Vaughn testified that while they were in the room to collect the GSR kit, Defendant's "condition deteriorated rather rapidly during that time," and Defendant was later transported to the hospital. Sergeant Vaughn noted that Defendant's condition was okay when he first walked into the room. He said, "I mean, he walked into the room. And it deteriorated rapidly. Conversations were very, very hard to have. He would literally nod off as he - - in mid-sentence." Sergeant Vaughn asked Defendant about injuries on his neck, and Defendant indicated that he and the victim had a disagreement. Sergeant Vaughn testified that he "inferred" from Defendant that Defendant had shot the victim, but Sergeant Vaughn did not testify what Defendant said that resulted in the inference. The results of the GSR kit were inconclusive. Sergeant Vaughn testified that the TBI Crime Lab report (stipulated to by the parties) contained the following: "These

results cannot eliminate the possibility that the individual could have fired, handled, or was near a gun when it was fired."

Sergeant Vaughn testified that Defendant told him that he had taken his "pill" that day. Later on in the conversation, Defendant told Sergeant Vaughn that he had taken six to eight Klonopin pills prior to the shooting, and he had taken approximately ten Klonopin pills after the shooting. Defendant was then transported by ambulance to the Hendersonville Medical Center Emergency Room.

Sergeant Vaughn testified that he went to Defendant's and the victim's home at approximately 4:00 a.m. and assisted with executing a search warrant. He returned to the scene on February 22, 2013, to assist the family in collecting some belongings. Sergeant Vaughn noticed "what appeared to be a copper jacket or something beside the fish tank in the living room." He collected the bullet fragment for testing.

Detective David Harrell of the Hendersonville Police Department testified that he obtained and executed the search warrant at the residence, and he assisted with the collection of evidence and photographing the scene. Detective Harrell found a lead fragment inside a towel in the living room. The fragment was sent to the TBI Crime Lab for testing. He also found a Glock pistol box in the master bedroom. Detective Harrell testified that at some point during the search, Detective James Garrett notified Detective Harrell that "he had found a birthday bag with balloons on it with firearms inside" located in the garage. There was a brown Carhartt garment on top of the bag. The weapons included: a Ruger .357 Magnum revolver with four live rounds and one fired shell casing in the cylinder, a loaded two-shot Derringer in a holster, and a Glock Model 22 .40 caliber semiautomatic pistol in a holster with a spare magazine on the holster. The magazine and the spare magazine of the Glock were both loaded. Other items in the birthday bag included loose ammunition for a .357 Magnum, a box of Winchester .40 caliber ammunition, a magazine loader for use on semi-automatic pistol magazines, and a laser light for a pistol. There was also clothing, a camera, and a Motorola phone inside the bag.

Special Agent Steve Scott, a forensic scientist with the TBI crime lab, Firearms Identification Unit, testified that the copper bullet fragment found on the window sill in the living room was fired from the Ruger revolver. He determined that a fired cartridge case was also fired from the revolver. Special Agent Scott testified that three additional bullet fragments were fired from the revolver. They appeared to all be from the same bullet. Special Agent Scott testified that the bullet fragment taken from the victim's head was also fired through the Ruger revolver. It was his opinion that only one bullet was fired in the present case.

6

Detective Gagnon was recalled as a witness. He testified that the two cell phones recovered from the residence were sent to the TBI crime lab where their contents were downloaded to a disc by Special Agent Howard Patterson. Detective Gagnon reviewed the contents of the disc and said that some of the files alluded to previous "emotional issues" of Defendant. He recalled some information on the disc regarding suicidal tendencies of Defendant the week prior to the shooting.

*Defendant's Proof*

Dr. Pamela Mary Auble, a psychologist, testified that she performs psychological and neuropsychological evaluations "that are often used in legal cases." She was contacted to evaluate Defendant in this case. Dr. Auble saw Defendant two times and spent a total of approximately seven hours with him. She reviewed Defendant's records and interviewed him and his grandmother. Dr. Auble also performed some tests on Defendant. She concluded that Defendant "was suffering from bipolar disorder, which is a severe mental illness, and that he had had that disorder for many years." Dr. Auble testified that Defendant was first diagnosed as bipolar at the age of 14, and he had been in and out of psychiatric hospitals. He also used illegal substances.

Concerning the present offense, Dr. Auble testified:

> At the time that this occurred, that illness was very much present. He was severely depressed. He had been in a psychiatric hospital less than a month before that, and his medication had not really been stabilized since then. He was very depressed; he was suicidal often.

> He was considering being readmitted to the hospital for shock treatments, which if you've seen *One Flew Over the Cuckoo's Nest*, that's what's going on in those. It's a very - - it's a last resort treatment for severe mental illness.

> So, at the time of the offense, he was very, very depressed. It's my opinion that that severe depression had a significant impact on him at the time that this occurred.

It was Dr. Auble's opinion that Defendant's "mental illness" affected his ability to "premeditate, to engage in reflection and judgment, to be free from excitement and passion." She testified that Defendant "mostly has said" the shooting was accidental and that the "gun went off," and the victim was killed. Defendant had also made couple of statements indicating that there was an argument.

7

Dr. Auble gave a review of Defendant's mental health history and treatment. Her diagnosis of Defendant was as follows:

> Bipolar disorder, bipolar I disorder; most recent episode, depressed, severe. Anxiety disorder I have said is not otherwise specified, but there is a reported history of post-traumatic stress disorder. He's also been diagnosed with panic disorder. I felt that a cognitive disorder not otherwise specified due to head injuries should be considered. And, actually, given the school records, I think he does have a cognitive disorder. I didn't know that originally, I didn't have those school records until fairly recently.
>
> He also has some substance abuse. He has cannabis abuse, anxiolytic abuse - - that's Klonopin - - alcohol abuse, and opioid abuse - - that's pain medications like Percocet and oxycodone. Those are in remission at this point. He's not doing any of those now. He's is jail. They're not available. So they're in remission due to incarceration.

Dr. Auble noted that "in 2012 - - late 2012, really 2013" Defendant had been "awarded social security disability for a severe mental illness and chronic back pain." She testified that Defendant and the victim had been married for five years, and "they had an up and down relationship." Dr. Auble testified that Defendant was severely depressed in 2013, and was in a psychiatric hospital. His medication was adjusted, and he was released. Dr. Auble testified that his condition did not show much improvement, and he saw Dr. Small on February 8, 2013. Defendant indicated that he was very depressed and very anxious. Dr. Small increased the frequency of Defendant's medication. Defendant began looking for someone to help with his children while the victim worked in the event that Defendant was admitted to the hospital for shock treatments.

Dr. Auble testified that on February 13, 2013, Defendant was in a lot of pain, and he took some narcotic pain medication. She stated that Defendant had previously been attempting to decrease his pain medication which resulted in more pain. Dr. Auble testified that Defendant had picked up some medication from Dr. Small on the morning of February 13, 2013, and he took the medicine as prescribed that morning. She stated that Defendant "may have taken it more in the afternoon." Dr. Auble noted that Klonopin affects memory, and Defendant had been taking it along with the narcotic pain medication. She stated that Defendant's memory about what happened from the time the victim came home from work until the time of the shooting was "patchy." She said that Defendant was not "sure what exactly happened." Dr. Auble testified that Defendant indicated that he had been wiping down a gun that he planned to sell because he had been "suicidal" when it "went off" and a bullet struck the victim in the head.

8

Dr. Auble's conclusion under the theory "espoused in the case of *State v. Hall*" was that:

> [A]t the time that this happened, he was suffering from mental disease, bipolar disorder. He was severely depressed. He also had some anxiety. There was some medication that was going on as well too; but, even without that, he was severely, severely, depressed. It's going to be you-all's decision if this was an accident or if it happened during an argument.
>
>       *        *        *
>
> Okay. If it happened during an argument, in the heat of an argument, because of his severe mental disease, in an argument he would have become very upset very easily. He's afraid of being abandoned, he's suicidal, he feels hopeless, he's not sure if he's going to live or die. So in the context of an argument, he would quickly have become in the state of passion, in a very upset, distraught state.
>
> If the shooting occurred while he's in the argument, it's going to be in a state of passion. He would not have been capable of premeditation, of reflection and judgment, of deliberation.

On cross-examination, Dr. Auble testified that she reviewed a summary of a statement by Jennifer Bond, who indicated that the victim had told her in the months preceding the shooting that Defendant told the victim that he would kill the victim if she ever left him. Dr. Auble acknowledged that Defendant's version of events indicated that he took three additional Klonopin pills after the victim picked up their son from school and arrived home. Defendant said that he was in a lot of pain because he had been decreasing his narcotic pain medication. Defendant also indicated to Dr. Auble that he did not remember much about what happened from 4:00 p.m. until the victim was shot. He did not recall arguing or fighting with the victim. Dr. Auble admitted that what Defendant told her contradicted what he told law enforcement officers after the shooting. Defendant told law enforcement that he and the victim had an argument over dinner, and he remembered that his children were in the bedroom watching a *Harry Potter* movie. Dr. Auble admitted that Defendant did not call 911 before taking his children to the neighbor's house. Defendant also moved the victim's body to the floor and began pouring water over her head. Dr. Auble was aware that all of the weapons were found in a "Happy Birthday" bag in the garage. She admitted that Defendant had a chronic problem with misusing pain medication.

9

Dr. Keith Caruso, a forensic psychiatrist, testified that he interviewed Defendant for three hours on August 1, 2014, and he reviewed medical and psychiatric records from various providers. Dr. Caruso also reviewed evaluations by Drs. Auble and Phillips, text messages, and "discovery provided by local law enforcement." Dr. Caruso further testified:

> There were some civil matters where there were restraining orders between the defendant and his wife filed against each other; witness statements. There were reports from TBI labs, notes from investigators, the crime scene video and photos, autopsy photos, toxicology reports, x-rays, other hospital records, social security evaluations on the defendant.
>
> And subsequent to preparing the report, I believe I've also seen both the discharge summary from his hospitalization of January 9th through 14th of 2013 at Parthenon Pavilion, and I saw a progress notes from February 8 of 2013, by Dr. Small, who was a psychiatrist who had seen him both on the inpatient service at Parthenon Pavilion and then saw him subsequently in his office. I believe also there was another report from Dr. Phillips that I saw.

It was Dr. Caruso's opinion that at the time of the offenses in this case, Defendant "was unable to form the requisite *mens rea* for premeditated murder due to a severe mental disease, bipolar I disorder, which led him to be in a major depressive episode at that time." Dr. Caruso testified that there was also "data" which indicated that Defendant may have been "intoxicated on a drug called Klonopin" at the time of the shooting which in his opinion would have impacted Defendant's mental state and rendered Defendant unable to form the requisite *mens rea* for premeditated murder. Dr. Caruso noted that the toxicology screen on Defendant after the shooting was positive for marijuana metabolites and Klonopin and its metabolites. Defendant also had oxycodone levels that were at the "maximal limit of the therapeutic range." Dr. Caruso also noted that Defendant had "time distortion," which was often seen in someone who was intoxicated on marijuana. Dr. Caruso's report contains the following concerning the shooting:

> On February 13, 2013, at approximately 10:00 p.m., [Defendant] had called 911 and tearfully reported that he had accidently shot his wife in the head with a .357 Magnum.
>
> His account at that time was they had been putting away their firearms and he had not known that that one was loaded. She was unconscious at that time, but could not be aroused, although she was still breathing.

10

Dr. Caruso testified that Defendant had attempted suicide several times, and he thought that Defendant had at least "12 psychiatric admissions." He said that Defendant also had panic disorder in addition to his bipolar disorder. Dr. Caruso testified that Defendant had an addiction to marijuana, alcohol, opioid pain medications, and medicines to treat anxiety. Defendant had also been treated with Ritalin as a child for attention deficit hyperactivity disorder. Dr. Caruso testified that Defendant had been given several different medications to treat his bipolar disorder, and he had also been given several different medications to treat depression. Dr. Caruso also added that Defendant may have had post-traumatic stress disorder previously "from abuse doled out by his biological father when he was young."

On cross-examination, Dr. Caruso testified that Defendant told him that he had previously loaded the gun used to kill the victim because he planned to commit suicide that day. However, he said that the victim and his children came home while he was doing that, and he decided to "abort the attempt and that that led to him having the gun loaded at the time the incident occurred." It was Dr. Caruso's opinion that Defendant was capable of formulating a plan to commit suicide on the day of the shooting because he was severely depressed. He also agreed that Defendant was capable of making the decision not to shoot himself once the victim and his children arrived home. Dr. Caruso agreed that on the day of the shooting, Defendant got his prescriptions filled, and he purchased Valentine's Day gifts for the victim and his children. Defendant indicated that he had sold a firearm to a former co-worker that day. He also told Dr. Caruso that he had been buffing the gun used in the shooting with a towel because someone else had expressed interest in buying it. Defendant said that he forgot the gun was loaded from his earlier suicide crisis and that it discharged striking the victim in the head.

Dr. Caruso agreed that after the shooting, Defendant took his children to the house of a neighbor who was a police officer. He told the neighbor that the victim had fallen and struck her head and that her brains were visible. Defendant then was able to form the intent to dial 911. Defendant also formed intent to take the Klonopin. Dr. Caruso felt that Defendant was suffering from a "major depressive episode almost continuously from January all the way through the offense."

Dr. William Watson, an expert forensic DNA analyst, testified that he reviewed the TBI case report and any related notes, the document, the testing, and the data generated in the present case concerning DNA. He did not examine the gun or perform any independent testing. Dr. Watson testified that presumptive testing on the Ruger revolver recovered from Defendant's house indicated the possible presence of blood. The TBI report stated that the "partial DNA profile is consistent with a mixture. The source is inconclusive." The report further read: "The partial mix DNA profile

11

generated from the top of the frame [of the gun] is consistent with a mixture of [the victim] and an inconclusive contributor."

Presumptive testing on the bottom frame of the gun also indicated the possible presence of blood. Further analysis generated a DNA partial profile consistent with a mixture. Both Defendant and the victim "were not excluded." Dr. Watson testified that the TBI report indicated that the grip and hammer of the gun were also swabbed for DNA. No further examination on those areas was performed. Dr. Watson testified that the report reflected that the trigger of the gun was not swabbed. He concluded:

> So we don't know who was handling, holding the grip, who might have cocked the trigger - - cocked the hammer, excuse me. And then there would be no way to determine whose finger was on the trigger at the time the gun was - - at any point.

Dr. Watson testified that the report stated that DNA swabs from the living room contained DNA profiles not belonging to Defendant or the victim.

On cross-examination, Dr. Watson testified that he was unaware that Defendant had told Dr. Auble and Dr. Caruso that the gun discharged as he was wiping it off, killing the victim.

*State's Rebuttal*

On rebuttal, Dr. Sandra Phillips, a clinical psychologist with Volunteer Behavioral Health and an expert in forensic psychology, testified that she began evaluating Defendant on March 25, 2013, while Defendant's case was at the general sessions level. She spent a total of four hours with Defendant over the course of three visits to determine his competency to stand trial. She reviewed the affidavit of complaint and any information received from both the defense and the prosecution. Dr. Phillips also reviewed Defendant's social history. There was a court-ordered evaluation of Defendant again in August of 2014. Dr. Phillips spent approximately "an hour and a quarter" with Defendant during that visit.

During their first interview, Defendant told Dr. Phillips that life had been "wonderful" prior to the shooting and that he and the victim had been communicating better with each other and attending church together. He said that he had been receiving disability payments for the previous eight months. Dr. Phillips testified that Defendant told her that he still felt stressed, and he talked about his depression. Defendant described himself as not often leaving the house, and he mostly lay in the bed all day and all night. Defendant said that he did not sleep well, was not shaving much, and he had not had a bath in approximately five weeks. Defendant told Dr. Phillips that the victim

12

had attempted to get him to go to the hospital to correct the dosage of his medication. However, Defendant described the victim as very understanding. He said that he did not feel well, and his appetite was poor. "He said he felt hopeless, lethargic, and just said it was physically hard for him to get out of bed at all."

Defendant told Dr. Phillips that the shooting took place on February 13, 2013, at approximately 4:00 p.m. He indicated that there had been nothing unusual about the night before. Defendant told Dr. Phillips that the victim left for work that morning, and he drove their son to school. Defendant and his daughter then went to Target to pick up his "mental health medication" that he had been without for a couple of days. Defendant told Dr. Phillips that while he waited at the pharmacy, he purchased some candy and a card for the victim for Valentine's Day. He and his daughter then went home and watched cartoons. Defendant told Dr. Phillips that his anxiety level felt higher, and he took his medication in the proper amount. He also stated that a friend stopped by his house and purchased one of Defendant's guns for $250.00.

Defendant told Dr. Phillips that he took an OxyContin pill and another Klonopin pill at the time the victim arrived home from work. He had also smoked a marijuana joint earlier that morning. Defendant told Dr. Phillips that at some point he and the victim took a bath and that he walked into the living room while the victim was sitting on the couch. He said that he had a bath towel and was wiping off a gun. He told Dr. Phillips that he could still hear the bath water draining from the tub. Defendant said that he felt depressed and hopeless at that time but he was not angry. He told Dr. Phillips that the gun discharged while the victim was sitting on the couch. Defendant claimed that the gun was not supposed to be loaded. He had also told Dr. Phillips that he was not supposed to own any guns, and he indicated that he was wiping his fingerprints off of the weapon in the event that he sold it. Defendant said that he took the children to the neighbor's house before calling 911 because he did not want them to be there when he called, and he did not want them to see the police and ambulance there. Defendant told Dr. Phillips that the children had been watching *Harry Potter* in the bedroom, and they did not come out when the gun discharged. After taking the children to the neighbor's house, Defendant said that he wrapped the victim in a towel and splashed water on her face to wake her up but she did not respond.

Dr. Phillips reviewed Defendant's medication and noted that he reported smoking marijuana for the past eight years, and he did not consider it to have any ill effects on him. He thought that it was helpful to him. Defendant denied telling officers that he had taken eight Klonopin pills prior to the shooting. He also denied that he had any alcohol or any other intoxicant in his system at the time of the shooting. Defendant said that he had no recollection of being at the Hendersonville Hospital after the shooting. During

their next interview, Defendant told Dr. Phillips that he had taken ten Klonopin pills and two or three additional Oxycodone pills after the shooting.

Dr. Phillips testified that she diagnosed Defendant with bipolar disorder at the time of the offense. She concluded that he was competent to stand trial. Dr. Phillips further testified:

> And my opinion was that at the time of the alleged offense he did suffer from severe mental disease, but I did not believe that it had rendered him unable to appreciate either the nature of the alleged act or its wrongfulness.

In considering the issue of diminished capacity, Dr. Phillips testified:

> I was looking at the whole issue of - - diminished capacity was the new thing. My conclusion at the end of that, to a reasonable degree of psychological certainty, was that [Defendant] did have the capacity to commit the crime with which he is charged; in other words, that he was - - he had the capacity to commit an intentional and premeditated act.

**Analysis**

*I.      Denial of Motions for a Judgment of Acquittal and the Challenge to the Sufficiency of the Evidence*

Defendant argues that the trial court erred by denying his motions for a judgment of acquittal because the law on diminished capacity, as outlined in *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997), unfairly shifted the burden of proof to the defense. Defendant further challenges the sufficiency of the evidence for his second degree murder conviction. He argues that "there was no reasonable basis in fact that he was in sole or unencumbered possession of the firearm (or for that matter possession of any kind)."

A motion for judgment of acquittal raises a question of law for the trial court's determination. *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). When the trial court is presented with a motion for judgment of acquittal, the only concern is the legal sufficiency, as opposed to the weight, of the evidence. *State v. Blanton*, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996). Appellate courts are ill-suited to assess whether the verdict is supported by the weight and credibility of the evidence. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995). Thus, appellate review is limited to sufficiency of the evidence pursuant to Rule 13(e) of the Rules of Appellate Procedure. *State v. Burlison*, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Accordingly, the standard by which

the trial court determines a motion for a judgment of acquittal is, in essence, the same standard that applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013).

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences drawn therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

### A. Denial of Motions for a Judgment of Acquittal

Rule 29 of the Tennessee Rules of Criminal Procedure provides as follows:

> Grounds for Judgment of Acquittal – On defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(b). "This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the [S]tate rests or at the conclusion of all the evidence." *State v. James*, 315 S.W.3d 440, 455 (Tenn. 2010) (citing *Overturf v. State*, 571 S.W.2d 837, 839 & n.2 (Tenn. 1978)). The trial court in this case denied Defendant's motions for judgment of acquittal after the close of the State's proof, at the conclusion of Defendant's case-in-chief, and at the close of the State's rebuttal proof. In denying the motion for judgment of acquittal at the close of Defendant's case-in-chief, the trial court made the following findings:

I will state that I will deny the Rule 29 motion. There is sufficient evidence to sustain a conviction right now. As I said the other day, in looking at Rule 29 you take all the evidence most favorable to the state and look at it in that way.

You do not look at the weight of the evidence. You look at the sufficiency of the evidence to the best light of the state.

Second, the due process violation of shifting the burden, that is a very interesting argument. It's an argument that [defense counsel] has pursued on occasion before. However, as you stated, [defense counsel], the rule in *Hall* is a rule of evidence. Should you desire to call witnesses, it's like a hearsay rule or any other rule of evidence; the rule must be satisfied before the evidence can be admitted, and that had been done.

I will note against that argument that the jury will be instructed on diminished capacity, and the jury will be instructed that the state has the burden of proof beyond a reasonable doubt as to the elements of the crime.

Diminished capacity will help explain the elements and the reasonable doubt, but the burden never, ever, shifts to the defense, and that will be clear in these instructions. So that request, again, it respectfully denied.

Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent. *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). In *Hall*, our supreme court explained:

[D]iminished capacity is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed. In other words, "diminished capacity" is actually a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state.

958 S.W.2d at 688 (citations omitted). However, "such evidence should not be proffered as proof of 'diminished capacity.' Instead, such evidence should be presented to the trial

16

court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." *Id.* at 690. Put another way, for expert testimony regarding a defendant's mental state to be admissible, the expert must testify that (1) the defendant has a mental disease or defect and that (2) because of the mental disease or defect, the defendant lacks the capacity to form the requisite mens rea. *See id.* at 689-91.

In *State v. Ferrell*, 277 S.W.3d 372 (Tenn. 2009), our supreme court discussed the ruling in *Hall*. The *Ferrell* court clarified that the "decision in *Hall* established that the [mental health] testimony is properly admissible if it satisfies the relevancy and expert testimony provisions in the Tennessee Rules of Evidence and its content indicates that a defendant lacked the capacity to form the required mental state for an offense . . . ." *Id.* at 379. Our supreme court explained that the *Hall* holding "was based upon the broader legal principle that 'expert testimony relevant to negating intent is admissible in Tennessee even though diminished capacity is not a defense.'" *Id.* (quoting *Hall*, 958 S.W.2d at 691). The court further explained that "*Hall* recognized that a defendant may negate an element of the offense as a defense to the prosecution." *Id.* at 380.

Defendant argues that the law on diminished capacity as set forth in *Hall* unfairly shifts the burden of proof to the defense. In this case, the State presented sufficient proof to support a conviction for first degree premeditated murder. There was proof that Defendant and the victim had some type of argument before the shooting. Defendant shot the unarmed victim in the head, and after the shooting he did not immediately call 911 for assistance. Before police arrived at the house, Defendant hid the gun in a bag in his garage, along with other weapons, with clothing on top of the bag.

Despite proof of the *mens rea* of first degree murder presented by the State in its case-in-chief, Defendant was convicted of the lesser-included offense of second degree murder. At no time did the burden of proof shift to Defendant. As pointed out by the State, *Hall* simply outlines the evidentiary rules for admitting expert proof of diminished capacity. "While diminished capacity is not an excuse or justification for committing the offense, it contemplates an acquittal of the indicted offense and a conviction for a lesser-included offense." *State v. Perry*, 13 S.W.3d 724, 733-34 (Tenn. Crim. App. 1999). Moreover, we point out that although the jury instructions are not included in the record, the trial court stated at trial that the jury would be "instructed that the state has the burden of proof beyond a reasonable doubt as to the elements of the crime." Defendant is not entitled to relief on this issue.

17

**B. Sufficiency of the Evidence**

Second degree murder is defined as "[a] knowing killing of another." T.C.A. § 39-13-210(a)(1). It is also a "result-of-conduct offense," and "[t]he statute focuses purely on the result and punishes an actor who knowingly causes another's death." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). Thus, as pertinent here, a person acts "knowingly" with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-13-302(b). Furthermore, "[a] person can act knowingly irrespective of his or her desire that the conduct or result will occur." *State v. Gray*, 960 S.W.2d 598, 604 (Tenn. Crim. App. 1997); *State v. Rutherford*, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993).

Defendant, relying on the testimony of Dr. Watson, contends that because the grip and trigger of the Ruger revolver were not tested, it is not clear who fired the weapon killing the victim. In the light most favorable to the State, the proof shows that after the shooting, Defendant took his children next door to Mr. Watts' house, and he told Mr. Watts that the victim had fallen and hit her head and that he could see her brains. At that time, Defendant had not called 911 to assist the victim. After police arrived, Defendant told Detectives that the victim had the weapon out and that Defendant was cleaning it and "making it look pretty, and the double action hammer was cocked back and it went off." Defendant told them that the victim was standing next to him when the weapon discharged. Defendant had initially told the officers who first arrived on the scene that the victim was sitting on the couch and shot herself while cleaning the gun. Detective Sergeant Jim Vaughn testified he spoke with Defendant at the Hendersonville Police Department, and Defendant mentioned something about grilling hot dogs and that the argument between him and the victim had lasted over the past two or three days. Detective Vaughn noticed scratches on Defendant and one in particular on the back of Defendant's neck. Defendant's knuckle was also swollen. When asked about the scratch on his neck, Defendant indicated that he and the victim had a disagreement. Defendant indicated that he thought the gun went off in his hand. The gun used in the shooting, along with other weapons, was eventually found hidden in Defendant's garage in a birthday gift bag with a Carhartt garment on top of it. Defendant told Dr. Auble, Dr. Caruso, and Dr. Phillips that he was holding the weapon and wiping it off when the victim was shot.

The evidence was sufficient to show that Defendant knowingly shot the unarmed victim in the head causing her death and was sufficient to support Defendant's second degree murder conviction. The fact that the trigger and grip of the revolver were not tested for DNA is irrelevant since Defendant admitted to several individuals, including his own expert witnesses, that he was holding the weapon when the victim was shot. Furthermore, Dr. Watson testified that a DNA profile, from which Defendant could not

18

be excluded, was found on the bottom frame of the gun.  Although Defendant claimed that he was cleaning the revolver when it accidently discharged, the jury was free to disbelieve his testimony, especially in light of testimony that there had been an argument and Defendant's actions after the shooting which consisted of taking his children to the neighbor's house before calling 911 and hiding the weapon.  Defendant is not entitled to relief as to this issue.

II.    *Sentencing*

Defendant contends that the trial court erred by imposing the maximum sentence for his second degree murder conviction. More specifically, he contends that: 1) the trial court did not properly consider statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and 2) the trial court made an erroneous assessment of the evidence.  The State responds that the sentence is "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute[.]"  We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  A finding of abuse of discretion "'reflects that the trial court's logic and reasoning were improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'"  *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement and mitigating factors are *advisory only*.  *See* T.C.A. § 40-35-114; *see also Bise*, 380 S.W.3d at 701; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).  Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion."  *Carter*, 254 S.W.3d at 345.  In other words, "the trial court is free to select *any sentence within the applicable range* so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act]."  *Id*. at 343 (emphasis added).  Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act."  *Id*. at 346.

In *Bise*, our supreme court held:

We hold, therefore, that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court *wholly departed* from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

*Bise*, 380 S.W.3d at 706 (emphasis added). In its conclusion, the supreme court pointed out that in sentences involving misapplication of enhancement factors (even in those cases where no enhancement factor actually applies) the sentences must still be affirmed if the sentences imposed are within the appropriate range, and the sentences are in compliance with statutory sentencing purposes and principles. *Id*. at 710.

Our General Assembly has enacted twenty-five (25) statutory sentencing enhancement factors; however, they are not binding upon the trial courts. T.C.A. § 40-35-114 (Supp. 2015). As previously noted, the weighing of mitigating and enhancement factors is left to the trial court's discretion, *Carter*, 254 S.W.3d at 345, and in fact the trial court's weighing of enhancement or mitigating factors is not a ground for appellate relief. *Id*.; T.C.A. § 40-35-401(b). The standard of review established in *Bise* provides that the minimum sentence can be imposed even if the trial court correctly applies all twenty-five enhancement factors, or conversely the maximum sentence can be imposed even if no statutory enhancement factors are applicable, so long as the sentence is within the correct range and the sentence complies with the sentencing purposes and principles.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. T.C.A. § 40-35-210(e); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of

reasonableness].” *Bise*, 380 S.W.3d at 705-06.  The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper.  T.C.A. § 40-35-401, Sentencing Comm’n Cmts.

The applicable sentencing range for a Range I offender convicted of a Class A felony is 15 to 25 years.  T.C.A. §§ 39-13-210(c); 40-35-112(b)(1).  The trial court explained in detail the factors that it considered in sentencing Defendant.  The court found as enhancement factors: (1) Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; (9) Defendant employed a firearm during the commission of the offense; and (13) at the time the felony was committed, Defendant was released on probation in the Davidson County General Sessions Court.    T.C.A. § 40-35-114(1), (9), and (13).  The record supports the application of these factors, and Defendant does not challenge their application.

The trial court found one mitigating factor, that Defendant was suffering from a mental or physical condition that significantly reduced Defendant’s culpability for the offense; however, the voluntary use of intoxicants does not fall within the purview of this factor.  T.C.A. § 40-35-113(8).

First, Defendant argues that the trial court did not properly consider statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee. At the sentencing hearing, the trial court stated:

> Now, in determining the appropriate sentence for this offense, I have considered the evidence presented at the trial.  I’ve reviewed all of that.  I’ve considered all the evidence at the sentenc[ing] hearing.  I’ve considered the testimony of everyone here.  I’ve considered the principles of sentencing and arguments made as to sentencing range here and the number to be imposed.  I’ve considered the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancement factors, any statistical information provided by the Administrative Office of the Courts as to sentencing practices, and the allocution that the defendant made own behalf about sentencing, and the defendant’s potential for rehabilitation and treatment.  That’s straight from the Tennessee Code.  Those are the things that I must consider, and nothing else.

At the hearing on Defendant's motion for new trial, the trial court stated that "the statistics are a part of what a judge considers in 40-35-210. And, generally, before I make a ruling, I go through all that and state what I've relied on [.]"

The trial court in this case clearly stated that it had considered all of the relevant sentencing information, and we have no reason to doubt the trial court's statement. *State v. Darrel Dean Hochhalter*, No. M2014-01106-CCA-R3-CD, 2015 WL 4556917, at *17 (Tenn. Crim. App. July 29, 2015).

Next, Defendant argues that the trial court made an erroneous assessment of the evidence at the sentencing hearing by stating: "What happened is the defendant took one of three guns that he illegally possessed as a convicted felon and he took a .357 Magnum and he pointed it at the head of his wife and he pulled the trigger." In his brief, Defendant contends that "there was no evidence presented at trial that as to the forensic evidence preserved and reported by the government, no evidence supported any theory of who might have pulled, pushed, or contacted the grip or the trigger." However, as pointed out by the State, the trial court's finding is supported by the evidence at trial and the jury's verdict. This included Defendant's own admissions that he illegally owned three weapons and that he shot the victim in the head.

Because the trial court properly considered the evidence offered by the parties, stated on the record what enhancement and mitigating factors were considered, complied with the purposes and principles of sentencing, and imposed a within range sentence, the trial court did not abuse its discretion in enhancing Defendant's sentence. Defendant is not entitled to relief.

Accordingly, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE